# 23-7613-cv

## United States Court of Appeals

*for the*

## Second Circuit

CERTAIN UNDERWRITERS AT LLOYDS, LONDON, INDIAN HARBOR
INSURANCE COMPANY, QBE SPECIALTY INSURANCE COMPANY,
STEADFAST INSURANCE COMPANY, GENERAL SECURITY
INDEMNITY COMPANY OF ARIZONA, UNITED SPECIALTY
INSURANCE COMPANY, LEXINGTON INSURANCE COMPANY, HDI
GLOBAL SPECIALTY SE, OLD REPUBLIC UNION INSURANCE
COMPANY, GEOVERA SPECIALTY INSURANCE COMPANY,
TRANSVERSE SPECIALTY INSURANCE COMPANY,

*Petitioners-Appellants,*

– v. –

MPIRE PROPERTIES, LLC,

*Respondent-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PETITIONERS-APPELLANTS

WAYNE R. GLAUBINGER
DAVID A. NELSON
SAMUEL B. WEISS
MOUND COTTON WOLLAN
 & GREENGRASS LLP
*Attorneys for Petitioners-Appellants*
One New York Plaza
One Water Street, 44th Floor
New York, New York 10004
(212) 804-4200

C P COUNSEL PRESS   (800) 4-APPEAL • (325706)

## CORPORATE DISCLOSURE STATEMENT

Under Fed. R. App. P. 26.1, Petitioners-Appellants make these disclosures:

1.    General Security Indemnity Company of Arizona is a direct, wholly owned subsidiary of SCOR Reinsurance Company, which is, in turn, a direct, wholly owned subsidiary of SCOR US Corporation. SCOR US Corporation is a direct, wholly owned subsidiary of SCOR SE, a publicly traded company organized under the laws of France.

2.    GeoVera Specialty Insurance Company is a subsidiary of GeoVera Holdings, Inc., which is a subsidiary of GeoVera Insurance Holdings, Ltd., a privately held company.

3.    HDI Global Specialty SE is a fully owned subsidiary of HDI Global SE. HDI Global SE is part of the Talanx Group, which trades publicly.

4.    Indian Harbor Insurance Company is a direct subsidiary of XL Specialty Insurance Company. XL Specialty Insurance Company is a wholly owned direct subsidiary of XL Reinsurance of America, Inc. Indian Harbor Insurance Company is an indirect subsidiary of X.L. America, Inc. (Delaware), XL Bermuda Ltd. (Bermuda), Exel Holding Limited (Cayman), XLIT Ltd. (Cayman), and XL Group Ltd. (Bermuda). The ultimate indirect parent corporation of Indian Harbor Insurance Company is XL Group Ltd., a publicly traded company domiciled in

Bermuda and listed on the New York Stock Exchange. No publicly held company owns 10% or more of its stock.

5.    Lexington Insurance Company is a direct, wholly-owned (100%) subsidiary of AIG Property Casualty U.S., Inc., which is a wholly- owned (100%) subsidiary of AIG Property Casualty Inc., which is a wholly-owned (100%) subsidiary of American International Group, Inc., which is a publicly-held corporation.

6.    Old Republic Union Insurance Company and Old Republic Specialty Insurance Underwriters are part of Old Republic International Corp. Old Republic International Corp is publicly traded. OR Union and ORSIU are wholly owned subsidiaries.

7.    QBE Specialty Insurance Company is a wholly owned subsidiary of QBE Holdings, Inc., which is wholly owned by QBE Investments (North America), Inc., which is wholly owned by QBE Insurance Holdings Pty. Ltd., which is wholly owned by QBE Insurance Group, Ltd., which is publicly traded on the Australian Securities Exchange.

8.    Steadfast Insurance Company is a wholly owned subsidiary of Zurich American Insurance Company. Zurich American Insurance Company is a wholly owned subsidiary of Zurich Holding Company of America, Inc. Zurich Holding Company of America, Inc. is wholly owned by Zurich Insurance Company Ltd,

which is directly owned by Zurich Insurance Group Ltd. Zurich Insurance Group Ltd is the only publicly traded parent company, with a listing on the Swiss stock exchange, and a further trading of American Depositary Receipts.

9.    Transverse Specialty Insurance Company is a wholly-owned subsidiary of Transverse Insurance Group, LLC, a privately held company.

10.    United Specialty Insurance Company is wholly owned by State National Insurance Company, Inc.

11.    Certain Underwriters at Lloyd's, London, severally subscribing to Certificate No. AMR-75573 are unincorporated associations and are not subject to the requirements of Fed. R. App. P. 26.1. Still, to enable judges to evaluate possible disqualifications or recusal, Certain Underwriters provide the following information:

a.    Lloyd's Syndicate 510 is managed by Tokio Marine Kiln Syndicates Ltd. (TMKS), which is a Lloyd's managing agent.  Liability for losses arising under insurance policies issued by a Lloyd's syndicate are borne by its members.

Lloyd's Syndicate 510 has multiple underwriting members.  Tokio Marine Underwriting Limited (TMUL) is an underwriting member of Syndicate 510 and has a share greater than 50% in Lloyd's Syndicate 510.  The other underwriting members have shares of less than ten percent each.  TMUL is a company organised in England, and is wholly owned by Tokio Marine & Nichido Fire Insurance Co.

Ltd, a company incorporated in Japan, which is wholly owned by Tokio Marine Holdings, Inc, a company incorporated in Japan and listed on the Tokyo Stock Exchange.

b.      Syndicate 1886, which is managed by QBE Underwriting Limited and whose ultimate parent company is QBE Insurance.

c.      Syndicate 2987, which is managed by Brit Syndicates Limited, is a wholly owned subsidiary of Brit Limited. Over 86% of Brit Limited is held, indirectly, by Fairfax Financial Holdings Limited, which is listed on the Toronto Stock Exchange. The rest of the beneficial interest in Brit Limited is held by OMERS (the Ontario Municipal Employees Retirement System).

d.      Syndicate 33 is managed by Hiscox Syndicates Limited, which is listed on the London Stock Exchange and is an indirectly wholly owned subsidiary of Hiscox Ltd.

e.      Lloyd's Syndicate 1880 is managed by Tokio Marine Kiln Syndicates Ltd. (TMKS), which is a Lloyd's managing agent.  Liability for losses arising under insurance policies issued by a Lloyd's syndicate are borne by its members.

Lloyd's Syndicate 1880 has one underwriting member, which is Tokio Marine Underwriting Limited (TMUL).  TMUL is a company organised in England, and is wholly owned by Tokio Marine & Nichido Fire Insurance Co. Ltd, a company

iv

incorporated in Japan, which is wholly owned by Tokio Marine Holdings, Inc, a company incorporated in Japan and listed on the Tokyo Stock Exchange.

f.      TAL Syndicate 1183 is managed by Talbot Underwriting Limited, whose ultimate parent company is American International Group, Inc.

g.      Syndicate 1856 has no publicly held corporations owning 10% or more of the capitalization of the syndicate.

h.      Syndicate 5886 is managed by Asta Managing Agency Limited, whose parent company is Asta Capital Limited.

i.      Syndicate 1618 is managed by Brit Syndicates Limited, which is a wholly owned subsidiary of Brit Limited. Over 86% of Brit Limited is held by Fairfax Financial Holdings Limited, which is listed on the Toronto Stock Exchange. The rest of Brit Limited is held by OMERS (the Ontario Municipal Employees Retirement System). Ki Financial Limited, a subsidiary of Brit Limited, is partially held, indirectly, by funds managed by Blackstone Tactical Opportunities, which contributes more than 10% of the capitalization of the Syndicate.

j.      Syndicate 2623 is managed by Beazley Furlonge Limited, whose the parent company is Beazley Furlonge Holdings Limited.

k.      Syndicate 2988 is managed by Brit Syndicates Limited. The Syndicate has several members, none of which has a 10% or greater ownership interest in the Syndicate. Brit Syndicates Limited is a wholly owned subsidiary of

Brit Limited. Over 86% of Brit Limited is held by Fairfax Financial Holdings Limited, which is listed on the Toronto Stock Exchange. The rest of the beneficial interest in Brit Limited is held by OMERS (the Ontario Municipal Employees Retirement System).

l.     Syndicate 2010 is managed by Lancashire Syndicates Limited (LSL). LSL is a wholly owned subsidiary of Cathedral Capital Holdings Limited, which is a wholly owned subsidiary of Cathedral Capital Limited, which in turn is a wholly owned subsidiary of Lancashire Holdings Limited.

m.     Syndicate 2121 is managed by Argenta Syndicate Management Limited, which is a wholly owned subsidiary of Argenta Holdings Limited, which in turn is wholly owned by Hannover Ruck SE. Talanx AG owns 50.2% of Hannover Re and itself is 79% owned by the ultimate parent, Haftpflichtverband der Deutschen Industrie V.a.G.

n.     Syndicate 1969 is managed by Apollo Syndicate Management Limited ("ASML"), a wholly owned subsidiary of Apollo Partners, LLP ("APL"). DCB Ibeson, Metacomet LLC and SAC White are partners of APL.

o.     Syndicate 609 is managed by Atrium Underwriters Ltd., a wholly owned subsidiary of Atrium Underwriting Group Ltd. A majority interest in Atrium Underwriting Group Ltd. is held by Enstar Group Ltd., a publicly traded company.

       p.     Syndicate 623 is managed by Beazley Furlonge Limited, whose parent company is Beasley plc, a publicly traded company on the London Stock Exchange.

       q.     Syndicate 3268 is owned, in part, by three entities that have more than 10% capitalization of the syndicate and has a publicly owned parent company: (1) Inter Hannover (No. 1) Ltd., which is a wholly owned subsidiary of Hannover Ruck SE, a publicly traded company; (2) PartnerRe Corporate Ltd., which is ultimately a wholly owned subsidiary of PartnerRe Ltd., a publicly traded company, along with its parent company Exor Nederland N.V.; and (3) SCOR Underwriting Limited, a wholly owned subsidiary of SCOR SE, which is a foreign publicly traded company.

       r.     Syndicate 727 is managed by S.A. Meacock & Company Limited.

/s/ Samuel B. Weiss

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF CONTENTS ......................................................................... viii

TABLE OF AUTHORITIES........................................................................x

PRELIMINARY STATEMENT....................................................................1

STATEMENT OF JURISDICTION ...............................................................3

STATEMENT OF THE ISSUES ..................................................................3

STATEMENT OF THE CASE......................................................................5

    I.    Statutory Background .....................................................................5

    II.    Factual and Procedural Background............................................8

SUMMARY OF ARGUMENT....................................................................10

ARGUMENT .........................................................................................15

    I.    The District Court Erroneously Resolved Questions of Arbitrability because the Parties Clearly and Unmistakably Delegated those Questions to the Arbitrators. ......................................................................15

    II.    State Law Does Not Reverse-Preempt Article II(3) of the New York Convention, Regardless of this Court's Conclusion in Stephens. .............19

        A.    Intervening Supreme Court Precedent Casts Sufficient Doubt on Stephens such that this Panel Is Free to Re-Do the Analysis and Reach the Correct Result...............................................................21

        B.    Stephens Aside, the First, Fourth, Fifth, and Ninth Circuits hold that the MFA Does Not Allow State Laws to Preempt the New York Convention, a View Shared by the United States Government. ....26

            1.    The New York Convention is Self-Executing, so the MFA Does Not Apply.......................................................................26

            2.    Even if the New York Convention were Not Self-Executing, the MFA Still Does Not Apply..........................................................29

C.     In all Events, this is an Ideal Case for this Court's Mini-En Banc Procedure Since Every Post-Stephens Indication Points to it Being Wrongly Decided. ..........................................................................33

III.  The New York Convention Aside, Section 868 Does Not Apply to Bar Arbitration Here. ............................................................................33

CONCLUSION ........................................................................................39

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

5556 Gasmer Mgmt. LLC v. Underwriters at Lloyd's, London,
    463 F. Supp. 3d 785 (S.D. Tex. 2020)...................................................18

711 Tchoupitoulas Condo. Ass'n, Inc. v. Indep. Specialty Ins. Co.,
    2023 WL 8716580 (E.D. La. Dec. 18, 2023).......................................34

Abbott v. Abbott,
    560 U.S. 1 (2010).................................................................................28

Adcock Prop. Mgmt., LLC v. Certain Underwriters at Lloyd's London,
    2023 WL 7929003 (S.D. Miss. Mar. 20, 2023) ...................................18

Am. Ins. Ass'n v. Garamendi,
    539 U.S. 396 (2003).............................................................................31

Arbaugh v. Y&H Corp.,
    546 U.S. 500 (2006).............................................................................25

AT&T Mobility LLC v. Concepcion,
    563 U.S. 333 (2011) ...............................................................................5

Barnett Bank of Marion Cnty., N.A. v. Nelson,
    517 U.S. 25 (1996).................................................................................6

Beachcorner Properties, LLC v. Indep. Specialty Ins. Co.,
    2023 WL 7280516 (E.D. La. Nov. 3, 2023).........................................35

Bourgeois v. Indep. Specialty Ins. Co.,
    2023 WL 6644171 (E.D. La. Oct. 12, 2023) .......................................35

Bufkin Enters. LLC v. Indian Harbor Ins.,
    2023 WL 2393700 (W.D. La. Mar. 7, 2023)................................. 34, 36

Carrollton Street Properties, LLC v. Indep. Specialty Ins. Co.,
    2024 WL 404955 (E.D. La. Feb. 2, 2024) ...........................................34

Casa Angelo, Inc. v. Indep. Specialty Ins. Co.,
    2023 WL 8600462 (E.D. La. Dec. 12, 2023)........................................35

Casey v. Merck & Co.,
    653 F.3d 95 (2d Cir. 2011) ...................................................................36

Causeway Partners, LLC, v. Indian Harbor Ins.,
    2024 WL 183484 (E.D. La. Jan. 17, 2024) .........................................34

Certain Underwriters at Lloyd's, London v. Mpire Properties, LLC,
    2023 WL 6318034 (S.D.N.Y. Sept. 28, 2023) .......................................9

Certain Underwriters at Lloyd's, London v. 3131 Veterans Blvd LLC,
    2023 WL 5237514 (S.D.N.Y. Aug. 15, 2023) ........................................9

CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Ga., LLC,
    142 S. Ct. 862 (2022) ...........................................................................29

CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Ga., LLC,
    8 F.4th 1007 (9th Cir. 2021) ............................................ 24, 25, 27, 29

Contec Corporation v. Remote Solution Company,
    398 F.3d 205 (2d Cir. 2005) .................................................................17

Corpus Christi Indep. Sch. Dist. v. Amrisc, LLC,
    2019 WL 2051696 (E.D.N.Y. May 9, 2019) ........................................18

Doctor's Assocs., Inc. v. Alemayehu,
    934 F.3d (2d Cir. 2019) ..................................................................11, 16

Donelon v. Shilling,
    340 So. 3d 786 (La. 2020) ...................................................................37

Doucet v. Dental Health Plans Mgmt. Corp.,
    412 So.2d  (La. 1982) ...........................................................................38

Ecuador v. Chevron Corp.,
    638 F.3d 384 (2d Cir. 2011) .................................................................17

EEOC v. Waffle House, Inc.,
    534 U.S. 279 (2002) .............................................................................38

ESAB Grp., Inc. v. Zurich Ins. PLC,
    685 F.3d 376 (4th Cir. 2012) ............................................ 13, 29, 30, 32

F.T.C. v. Travelers Health Ass'n,
   362 U.S. 293 (1960)................................................................32

Factors Etc. v. Pro Arts,
   652 F.2d 278 (2d Cir. 1981) ...............................................36

Fairway Vill. Condos. v. Indep. Specialty Ins.,
   2023 WL 2866944 (E.D. La. Apr. 10, 2023) ......................34

First Options of Chicago, Inc. v. Kaplan,
   514 U.S. 938 (1995)................................................................16

Foster v. Neilson,
   27 U.S. 253 (1829)................................................................20

Gelman v. Ashcroft,
   372 F.3d 495 (2d Cir. 2004) ...............................................21

Greathouse v. JHS Sec. Inc.,
   784 F.3d 105 (2d Cir. 2015)................................................24

Green Enterprises, LLC v. Hiscox Syndicates Ltd. At Lloyd's of London,
   68 F.4th 662 (1st Cir. 2023) ....................................... 24, 27

Harbor Homeowner's Ass'n v. Certain Underwriters at Lloyd's, London,
   2024 WL 147853 n.19 (E.D. La. Jan. 12, 2024)...............34

Heart 2 Heart Fam. Worship Ctr. v. Indep. Specialty Ins. Co.,
   2023 WL 8494536 (E.D. La. Nov. 1, 2023)........................35

Henry Schein, Inc. v. Archer & White Sales, Inc.,
   139 S. Ct. 524 (2019)...........................................................16

Hodges v. Reasonover,
   103 So.3d 1069 (La. 2012) ..................................................37

In re BDC 56 LLC,
   330 F.3d 111 (2d Cir. 2003) ...............................................25

In re Zarnel,
   619 F.3d 156 (2d Cir. 2010) ................................. 21, 23, 25

James River Ins. Co. v. Blue Ox Dance Hall, LLC,
    2017 WL 5195877 (N.D. Okla. Nov. 9, 2017)......................................8

Kentucky Ass'n of Health Plans, Inc. v. Miller,
    538 U.S. 329 (2003)......................................6

La. Safety Ass'n of Timbermen--Self Insurers Fund v. Certain Underwriters at
    Lloyd's, London,
    562 U.S. 827 (2010)......................................29

Leftridge v. Connecticut State Trooper Officer No. 1283,
    640 F.3d 62 (2d Cir. 2011) ......................................3

Loyal Tire & Auto Ctr. v. Town of Woodbury,
    445 F.3d 136 (2d Cir. 2006) ......................................21

Medellín v. Texas,
    552 U.S. 491 (2008)...................................... passim

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,
    473 U.S. 614 (1985)......................................38

Napoleon Apartments, LLC v. Indep. Specialty Ins. Co.,
    2024 WL 398427 (E.D. La. Feb. 1, 2024) ......................................34

NASDAQ OMX Grp., Inc. v. UBS Sec., LLC,
    770 F.3d 1010 (2d Cir. 2014) ......................................4, 17

Next Level Hosp. LLC v. Indep. Specialty Ins.,
    2023 WL 2771583 (W.D. La. March 31, 2023)......................................34

Queens Beauty Supply, LLC v. Indep. Specialty Ins. Co.,
    2023 WL 7154117 (E.D. La. Oct. 31, 2023)......................................35

Ramsey v. Indep. Specialty Ins. Co.,
    2023 WL 5034646 (E.D. La. Aug. 8, 2023)......................................35

Rent-A-Ctr., W., Inc. v. Jackson,
    561 U.S. 63 (2010)......................................11, 15, 16, 17

Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London,
    587 F.3d 714 (5th Cir. 2009) ...................................... passim

Salve Regina Coll. v. Russell,
  499 U.S. 225 (1991) ..................................................................4

Scherk v. Alberto–Culver Co.,
  417 U.S. 506 (1974) ............................................................ 37, 38

Schnabel v. Trilegiant Corp.,
  697 F.3d 110 (2d Cir. 2012) ...............................................4, 15

Siddiqui Enterprises, LLC v. Indep. Specialty Ins. Co.,
  2024 WL 209037 (E.D. La. Jan. 19, 2024) ...............................34

Southland Circle, LLC v. Indep. Specialty Ins. Co.,
  2023 WL 7688570 (E.D. La. Nov. 15, 2023) ........................ 35, 39

Stadtlander v. Ryan's Fam. Steakhouses, Inc.,
  794 So.2d 881 (La. Ct. App. 2001) ...........................................37

Stephens v. Am. Int'l Ins. Co.,
  66 F.3d 41 (2d Cir. 1995) ................................... 4, 10, 12, 20

Stephens v. Nat'l Distillers and Chem. Corp.,
  69 F.3d 1226 (2d Cir. 1995) ............................... 12, 25, 32

Sumitomo Shoji Am., Inc. v. Avagliano,
  457 U.S. 176 (1982) ...............................................................28

The Cornerstone Ass'n v. Indep. Specialty Ins. Co.,
  2023 WL 8257987 (E.D. La. Nov. 29, 2023) .............................35

Union Bethel African Methodist Episcopal Church v. Indep. Specialty Ins. Co. et al.,
  2023 WL 8804895 (E.D. La. Dec. 20, 2023) ............................34

Union of Needletrades, Indus. & Textile Emps. v. U.S. I.N.S.,
  336 F.3d 200 (2d Cir. 2003) ...................................................21

United States v. Kahn,
  5 F.4th 167 (2d Cir. 2021) ......................................................23

United States v. Peguero,
  34 F.4th 143 (2d Cir. 2022) ....................................................33

Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,
  515 U.S. 528 (1995) ...................................................................33

Wells Fargo Advisors, LLC v. Sappington,
  884 F.3d 392 (2d Cir. 2018) ....................................................... 17, 18

Wojchowski v. Daines,
  498 F.3d 99 (2d Cir. 2007) .........................................................21

Ytech 180 Units Miami Beach Invs. LLC v. Certain Underwriters at Lloyd's,
  London,
  359 F. Supp. 3d 1253 (S.D. Fla. 2019) ...................................18

Yukos Cap. S.A.R.L. v. Feldman,
  977 F.3d 216 (2d Cir. 2020) .........................................................4

## Statutes

28 U.S.C. § 1291 ..............................................................................3

28 U.S.C. § 2283 ..............................................................................9

Federal Arbitration Act, 9 U.S.C. § 1 et seq. ................................. passim

La. R.S. § 22:2004 ..........................................................................37

La. R.S. § 22:446 ........................................................................7, 39

La. R.S. § 22:868 .................................................................. passim

McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq. ......................... passim

U.S. Const. art. III ..........................................................................3

U.S. Const. art. VI ..........................................................................19

## Rules

Fed. R. App. P. 45(c) .....................................................................33

## Other Authorities

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Dec.
  29, 2970, 21 U.S.T. 2517, 330 U.N.T.S. 3, 1970 WL104417 ..................... passim

INSURERS, 2020 La. Sess. Law Serv. Act 307 (S.B. 156) ....................................38

Solicitor General's Brief .................................................................... 28, 29

UNCITRAL, Note by the Secretariat, Report on the Survey Relating to the
Legislative Implementation of the Convention on the Recognition and
Enforcement of Foreign Arbitral Awards, A/CN.9/656 .......................................28

## PRELIMINARY STATEMENT

Petitioners-Appellants, the Insurers, are surplus lines insurance carriers who provide first-party commercial property insurance in high-risk zones, including Louisiana. In the wake of hurricanes that regularly hit these areas, the Insurers often pay hundreds of millions of dollars to help policyholders repair damage and recover lost business income. But sometimes, like now, there are disputes between insurers and a policyholder. In anticipation of such a dispute, the Insurers here and Respondent-Appellee Mpire Properties, LLC[1] agreed to arbitrate in New York "all matters in difference" between them "in relation to this insurance." A67.

The Insurers agreed to this contract because several sources of state and federal law, including a treaty entered into by the United States, protected their ability to arbitrate. And yet MPIRE has ignored the parties' arbitration agreement. After its property was damaged during 2021's Hurricane Ida, MPIRE's predecessor filed a claim under the Policy. Believing the Insurers improperly failed to pay the claim, MPIRE sued in Louisiana state court without regard to the arbitration clause. So the Insurers moved to compel arbitration in federal district court in New York

---

[1] The Insurers originally issued the policy here to a different entity, Bayou Bulldog Apartments, LLC. But the covered property was later sold, and the rights under the policy were purportedly transferred to MPIRE.

(where the parties had agreed to arbitrate) and to enjoin the Louisiana state court lawsuit.

The District Court erred by refusing to compel arbitration. First, the District Court decided arbitrability without analyzing whether the parties had agreed to have the arbitration panel decide those issues. They did. Second, the District Court held that a Louisiana statute—La. R.S. § 22:868—prohibited giving force to the arbitration clause in the policy, even though Section 868 expressly *allows* surplus lines carriers to insert a "forum or venue selection clause" (like an arbitration clause) into their policies.

Finally, the District Court—finding itself bound by a 1995 decision from this Court—held that the McCarran-Ferguson Act ("MFA") permitted Section 868 (as erroneously interpreted by the District Court below) to reverse-preempt a treaty protecting the right to arbitrate disputes like this. But an intervening Supreme Court decision (not to mention subsequent decisions by four other courts of appeals, and the view of the Executive Branch, whose opinions on treaties are given great weight) requires this panel to revisit the issue on its own. If the panel feels bound by circuit precedent, this case presents a perfect vehicle for the Court's "mini-en banc procedure."

This Court should reverse the District Court's order, and require this matter to proceed to arbitration, where the parties agreed to submit their disputes.

2

## STATEMENT OF JURISDICTION

The District Court had original jurisdiction under 9 U.S.C. § 203. The District Court also had jurisdiction because the arbitration clause at issue falls under the Convention on the Recognition and Enforcement of Arbitral Awards of June 10, 1958[2] (the "New York Convention")—an international treaty. <u>See</u> U.S. Const. art. III, § 2. On September 28, 2023, the District Court issued its Opinion and Order denying the Insurers' petition to compel arbitration. A250. On October 27, 2023, the Insurers filed a notice of appeal from the District Court's order. A261. This Court has jurisdiction under 9 U.S.C. § 16(a) and 28 U.S.C. § 1291.[3]

## STATEMENT OF THE ISSUES

I.     Whether—by requiring that "all matters in difference," including questions of the policy's "validity," be arbitrated—the arbitration clause delegated arbitrability to the arbitration panel, rather than to the District Court. This issue is

---

[2] 21 U.S.T. 2517, 330 U.N.T.S. 3, 1970 WL 104417.

[3] Because the District Court's Opinion and Order ended the litigation on the merits and left nothing else for the court to do, the District Court's decision constitutes a final judgment and is thus also appealable under 28 U.S.C. § 1291. <u>See, e.g.</u>, <u>Leftridge v. Connecticut State Trooper Officer No. 1283</u>, 640 F.3d 62, 66 (2d Cir. 2011) ("In determining whether a decision is 'final' within the meaning of § 1291, we are to give that section a 'practical rather than a technical construction,' and a decision 'by which a district court disassociates itself from a case' is deemed to be final.") (cleaned up).

reviewed *de novo*. <u>NASDAQ OMX Grp., Inc. v. UBS Sec., LLC</u>, 770 F.3d 1010, 1031 (2d Cir. 2014).

II.     Whether the United States Supreme Court's decision in <u>Medellín v. Texas</u>, 552 U.S. 491 (2008), sufficiently casts doubt on <u>Stephens v. Am. Int'l Ins. Co.</u>, 66 F.3d 41 (2d Cir. 1995)—in which a panel of this Court concluded that the MFA permits a state law to reverse-preempt the New York Convention because the treaty was not self-executing—such that this panel should reconsider <u>Stephens</u>, or whether <u>Stephens</u> should be overruled via the mini-en banc process or en banc because, as the District Court recognized, <u>Stephens</u> has been repeatedly rejected by this Court's sister circuits since it was issued in 1995, was criticized by another panel of this Court shortly after it was handed down, and conflicts with the Executive's interpretation of the New York Convention. The underlying question is reviewed de novo. <u>Schnabel v. Trilegiant Corp.</u>, 697 F.3d 110, 118 (2d Cir. 2012).

III.     Whether La. R.S. § 22:868, which expressly allows surplus lines carriers' policies to include a "forum or venue selection clause," allows those carriers to agree to submit disputes to an arbitration venue. The District Court's interpretation and application of state law is reviewed de novo. <u>Yukos Cap. S.A.R.L. v. Feldman</u>, 977 F.3d 216, 241 (2d Cir. 2020); <u>see also</u>, <u>Salve Regina Coll. v. Russell</u>, 499 U.S. 225, 231 (1991).

## STATEMENT OF THE CASE

The questions on appeal all relate to whether a dispute with insurers about insurance coverage for property damage is subject to arbitration. Unlike in a garden variety arbitration case, however, there is no real dispute about whether the underlying claims in dispute fall within the scope of the arbitration clause at issue. They do.

Rather, as the court below (Abrams, J.) recognized, whether the parties' dispute is arbitrable turns on the interplay between three different statutory regimes and a treaty: 1) the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4; 2) the MFA, 15 U.S.C. § 1011 et seq.; 3) a provision of Louisiana insurance law, La. R.S. § 22:868; and 4) the treaty, the New York Convention.

## I. Statutory Background

The FAA provides that any arbitration clause in a contract involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided." 9 U.S.C. § 2. So if a federal court finds that the agreement was made, the FAA directs that "the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. The FAA ordinarily has broad preemptive effect over state law. See, e.g., AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 341–42 (2011).

But the MFA gives the states special domain over "[t]he business of insurance," 15 U.S.C. § 1012(a), and permits some state insurance laws to "reverse-preempt" federal law in some cases. The MFA states: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b); see also, e.g., Kentucky Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329, 342 (2003) (reverse preemption of ERISA under the MFA applies only if "the state law [is] **specifically** directed toward entities engaged in insurance" and it "substantially affect[s] the risk pooling arrangement between the insurer and the insured") (emphasis added); Barnett Bank of Marion Cnty., N.A. v. Nelson, 517 U.S. 25, 39 (1996) (the MFA "does not seek to insulate state insurance regulation from the reach of all federal law").

Here, a particular Louisiana insurance law is alleged, because of the MFA, to displace the contracting parties' ability to arbitrate under Chapter 1 of the FAA. The Louisiana statute in question provides in pertinent part:

> A. No insurance contract delivered or issued for delivery in this state and covering subjects located … in this state … shall contain any condition, stipulation, or agreement …:
>
> (2) Depriving the courts of this state of the jurisdiction or venue of action against the insurer…
>
> ***

6

C.  Any such condition, stipulation, or agreement in violation of this Section shall be void, but such voiding shall not affect the validity of the other provisions of the contract.

D.  The provisions of Subsection A of this Section shall not prohibit a forum or venue selection clause in a policy form that is not subject to approval by the Department of Insurance.

La. R.S. § 22:868.

Surplus lines insurers, like the Insurers here, fall under the paragraph D exception, because Louisiana exempts them from having to file or seek approval of forms for property and casualty insurance (except for forms as to public carrier vehicles, which are not at issue here). La. R.S. § 22:446; see also A191-249.

Finally, and most critically for any determination of whether the claims here are arbitrable, the New York Convention, a multilateral treaty to which the United States acceded in 1970, states in relevant part:

> *The court of a Contracting State*, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, *shall*, at the request of one of the parties, *refer the parties to arbitration*, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

New York Convention art. II(3) (emphases added).

## II.        Factual and Procedural Background

The Insurers, a group of surplus lines carriers,[4] entered into an insurance contract (the "Policy") with Bayou Bulldog Apartments, LLC, regarding seventy-five properties in and around New Orleans, Louisiana. A16, A26, A160-61. That Policy contains an arbitration clause which provides, in relevant part:

> ARBITRATION CLAUSE: All matters in difference between the Insured and the Companies (hereinafter referred to as "the parties") in relation to this insurance, including its formation and validity, and whether arising during or after the period of this insurance, shall be referred to an Arbitration Tribunal in the manner hereinafter set out.
>
> ***
>
> The seat of the Arbitration shall be in New York and the Arbitration Tribunal shall apply the law of New York as the proper law of this insurance.

A67.

---

[4] According to the United States Government Accountability Office, "surplus lines insurers fill an important niche in the insurance market by covering otherwise uninsurable risks, and surplus lines insurers require flexibility to modify exclusions and coverages in order to manage unusual risks that admitted insurers deem uninsurable." James River Ins. Co. v. Blue Ox Dance Hall, LLC, 2017 WL 5195877, at *3 (N.D. Okla. Nov. 9, 2017); see also, generally, U.S. World & News Report, Surplus Lines Insurance, https://www.usnews.com/insurance/glossary/surplus-lines-insurance (updated August 21, 2023) (explaining that surplus lines insurance is "specialized coverage written by unlicensed, nonadmitted insurance companies to cover specific extraordinary items and uncommon or high risks that are generally not covered by traditional insurance companies under standard policies").

After Hurricane Ida struck Louisiana in August 2021 and damaged the covered property, Bayou Bulldog made a claim under the Policy. A18. Then, in December 2021, Bayou Bulldog sold the property at issue to MPIRE, the Respondent-Appellee here. A18. Included in that sale was an agreement in which Bayou Bulldog purportedly assigned all its rights under the Policy relating to its Hurricane Ida insurance claim to MPIRE. A18.

That November, MPIRE sued some Insurers in Louisiana state court. A158. In response, and consistent with the Policy's terms, the Insurers brought a petition to compel arbitration in the Southern District of New York. In doing so, the Insurers invoked the New York Convention and the arbitration clause's broad delegation provision. A17, A185. And because MPIRE's Louisiana lawsuit violated the arbitration clause, the Insurers also sought an injunction of the Louisiana lawsuit under 28 U.S.C. § 2283. A187. MPIRE opposed the Insurers' petition and motion.

Adopting wholesale a district court decision decided a month earlier,[5] the District Court denied the Insurers' petition to compel arbitration and denied as moot the Insurers' motion to enjoin. A250 (reported at <u>Certain Underwriters at Lloyd's, London v. Mpire Properties, LLC</u>, 2023 WL 6318034 (S.D.N.Y. Sept. 28, 2023)).

---

[5] <u>Certain Underwriters at Lloyd's, London v. 3131 Veterans Blvd LLC</u>, 2023 WL 5237514 (S.D.N.Y. Aug. 15, 2023), <u>appeal docketed</u> No. 23-1268 (2d Cir.).

First, despite the arbitration clause's unmistakable delegation of "all matters in difference between the [parties] . . . in relation to this insurance, including its formation and validity," the District Court presumed to decide arbitrability on its own. A252.

Then, the District Court concluded that Louisiana state law renders the parties' arbitration agreement unenforceable because, the District Court concluded, an arbitration clause is not a type of forum or venue selection clause that Section 868(D) expressly permits surplus lines insurers to include in their policies, despite recent Louisiana precedent concluding the opposite. A257-58.

Finally, because this Court has held that the MFA preempts the New York Convention, the District Court applied Section 868 "without regard for the effect of the Convention." A259; see Stephens v. Am. Int'l Ins. Co., 66 F.3d 41 (2d Cir. 1995). Ultimately, the District Court concluded that Section 868 renders unenforceable the arbitration clause in the Policy, and that Section 868(D) does not exempt surplus lines carriers from this prohibition. A259-60.

## SUMMARY OF ARGUMENT

I.       The District Court wrongly decided arbitrability. The question the District Court answered (incorrectly)—whether the parties' dispute was arbitrable— is a threshold question delegated to the arbitration panel under the Policy's terms.

The Policy delegates "all matters in difference . . . in relation to this insurance, including its . . . validity" to the arbitration panel. A67.

Under this Court's and the Supreme Court's precedent, parties can adopt "delegation provisions" under which they agree "to arbitrate threshold issues concerning the arbitration agreement." See Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 68 (2010). That includes issues "related to the enforceability or scope of the arbitration clause." Doctor's Assocs., Inc. v. Alemayehu, 934 F.3d at 245, 251 (2d Cir. 2019).

The District Court was squarely presented with this issue but failed to address it at all. Rather, after reciting the legal standard for delegation of threshold issues, the District Court failed to analyze the Policy language here. A252. It also did not conclude—nor could it—that it was appropriate for the District Court to decide arbitrability in the face of the delegation clause. A252. Instead, it simply ignored the Policy's delegation clause, which expressly reserves "all matters in difference"—including validity—for the arbitration panel. The District Court also wrongly presumed that MPIRE's challenge to the validity of the arbitration clause was its to decide. A252.

The type of delegation clause found in the Policy unmistakably delegates threshold questions of arbitrability to the arbitration panel. The District Court

11

therefore erred in deciding arbitrability, which, under the Policy, is delegated to the arbitration panel.

II.      While the MFA permits certain state laws that were enacted to regulate the business of insurance to reverse-preempt certain "Acts of Congress," it does not insulate state insurance regulation from the reach of all federal law. More to the point here, the MFA does not permit state law to reverse-preempt the New York Convention, a self-executing, multi-lateral treaty, for three reasons.

**First**, the Policy here, including its arbitration clause, is subject to the New York Convention, which mandates that the Courts of the United States "shall … refer the parties to arbitration" when a party requests that it do so. Under Supreme Court precedent, this mandatory language commands courts to channel arbitrable disputes to arbitration and, because it provides a clear "directive to domestic courts," is regarded as "self-executing." Medellín, 552 U.S. at 508.

The Supreme Court's holding in Medellín casts doubt on this Court's decision in Stephens v. Am. Int'l Ins. Co., 66 F.3d 41 (2d Cir. 1995). Stephens, decided almost 30 years ago, held that the New York Convention is not self-executing, and that therefore, the MFA reverse-preempts the New York Convention. But as the Ninth and First Circuits have both recognized, Stephens' approach directly conflicts with Medellín and is in tension with another panel decision of this Court. Stephens v. Nat'l Distillers and Chem. Corp., 69 F.3d 1226, 1233 n.6 (2d Cir. 1995) ("Stephens

12

II"). And it is also inconsistent with the Executive's view (which is given great weight) that the New York Convention is self-executing.

Given this inconsistency, and using <u>Medellín</u>'s clear standard for determining when a treaty is self-executing, the Court should revisit its prior analysis. And it should conclude—like the First and Ninth Circuits (each of which applied Medellín to reject Stephens) have—that the New York Convention is self-executing.

**<u>Second</u>**, even if this Court does not conclude that the New York Convention is self-executing, the New York Convention is not an "Act of Congress," and is therefore not subject to the MFA. The reason is simple: just because a treaty is implemented by Congress, does not mean that it ceases to be a treaty and becomes an "Act of Congress." Instead, it remains an international agreement or contract, negotiated by the Executive Branch, and ratified by the Senate. As the Fourth Circuit has recognized, the MFA limited congressional preemption under the commerce power, but did not intend for the MFA to permit state law to interfere with international agreements entered by the United States. <u>ESAB Grp., Inc. v. Zurich Ins. PLC</u>, 685 F.3d 376, 388 (4th Cir. 2012). Or, as put by the Fifth Circuit, an "'Act of Congress' does not include a 'treaty,' even if the treaty required implementing legislation." <u>Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London</u>, 587 F.3d 714, 723 (5th Cir. 2009). This view, too, is shared by the Executive.

Therefore, even if the New York Convention were not self-executing, it would still preempt Section 868, because the MFA only reverse-preempts "Acts of Congress," which the New York Convention is not.

**Finally**, Section 868 does not reverse-preempt the New York Convention because MPIRE's position—that under the statute, the Policy here cannot contain an arbitration provision—ignores the plain language of the statute and has been rejected by nearly all of the district courts to consider the issue.

While Section 868(A) prohibits provisions in insurance contracts that deprive Louisiana's courts "of the jurisdiction or venue of action against the insurer," Subsection D contains a significant and dispositive carve-out, allowing forum or venue selection clauses for policy forms "not subject to approval by the Department of Insurance." It is undisputed that the Policy at issue here is a surplus lines policy "not subject to approval by the Department of Insurance," and the overwhelming weight of authority—both in Louisiana and elsewhere—recognizes that arbitration clauses are a type of forum selection clause. Therefore, the arbitration clause at issue here is not precluded by Section 868, the MFA never comes into play, and the New York Convention still controls.

In any event, the "868(D) question" is teed up in at least six cases before the Fifth Circuit, which already heard oral argument on this issue on January 9. This Court need not wade into that area of unsettled Louisiana law, because the New York

Convention is not reverse-preempted by the MFA. But if the Court does conclude that the 868(D) question is dispositive, it can simply follow what the Fifth Circuit decides, as this Court's longstanding precedent requires.

## ARGUMENT

Under the FAA, the New York Convention, this Court's precedent, and Supreme Court precedent, this Court should reverse and compel arbitration because: (1) the arbitration panel—and not the District Court—should determine arbitrability; (2) the Policy, which includes foreign insurers, is controlled by the New York Convention, which is not reverse-preempted by state law under the MFA; and (3) Louisiana law permits surplus lines insurers to include arbitration clauses in their policies. The District Court's refusal to compel arbitration is reviewed de novo. Schnabel, 697 F.3d at 118.

## I.     The District Court Erroneously Resolved Questions of Arbitrability because the Parties Clearly and Unmistakably Delegated those Questions to the Arbitrators.

The District Court erred at the outset by resolving whether the MFA and Section 868 precluded the arbitration of the dispute here. The Policy's arbitration clause expressly delegated such questions to the arbitration panel. A67. But MPIRE's attacks on arbitration all affect the arbitration agreement as a whole, not the delegation clause specifically. Thus, arbitrability was for the arbitrators alone to decide. See, e.g., Rent-A-Ctr., 561 U.S. at 71-72.

The FAA presumes that courts will decide issues of arbitrability. <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944–45 (1995)). But the Supreme Court "has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." <u>Henry Schein, Inc. v. Archer & White Sales, Inc.</u>, 139 S. Ct. 524, 530 (2019).

Here, the Policy under which MPIRE seeks coverage contains an explicit arbitration clause. <u>See</u> A67. Thus, the only basis for challenging whether this dispute is subject to arbitration is MPIRE's contention that state law renders unenforceable the arbitration clause to which the parties agreed.

But, as to that question (and similar validity or enforceability questions), parties can adopt "delegation provisions" under which they agree "to arbitrate threshold issues concerning the arbitration agreement." <u>Rent-A-Ctr.</u>, 561 U.S. at 68. Among the questions that "the parties may choose to delegate" are those "related to the enforceability or scope of the arbitration clause." <u>Doctor's Assocs.</u>, 934 F.3d at 251; <u>see also</u> <u>Henry Schein</u>, 139 S. Ct. at 529 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue.").[6]

---

[6] A court can decide a "challenge [to] the delegation provision specifically," <u>see</u> <u>Rent-A-Ctr.</u>, 561 U.S. at 72, but MPIRE has not done so. Rather, as in *Rent-a-Center*,

This Court has repeatedly found the "clear and unmistakable" requirement satisfied where "a broad arbitration clause expressly commits all disputes to arbitration, concluding that *all* disputes necessarily includes disputes as to arbitrability." NASDAQ, 770 F.3d at 1031; see also Wells Fargo Advisors, LLC v. Sappington, 884 F.3d 392, 396 (2d Cir. 2018) ("any controversy or dispute" includes dispute over arbitrability).

Here, the Policy sends "all matters in difference," including the "validity" of the Policy (and the arbitration clause within), to an arbitration panel. A67. This is precisely the type of provision that the Supreme Court, this Court, and others have held delegates arbitrability to the arbitrator. See, e.g., Rent-a-Ctr., 561 U.S. at 68 (giving effect to agreement to delegate to an arbitrator resolution of "any dispute relating to the . . . enforceability . . . of the [Arbitration] Agreement"); Rep. of Ecuador v. Chevron Corp., 638 F.3d 384, 395 (2d Cir. 2011) (enforcing delegation provision and reaffirming Contec Corporation v. Remote Solution Company, 398 F.3d 205, 208 (2d Cir. 2005), which "concluded that … language [permitting the arbitrator to rule on objections to, *inter alia*, the scope or validity of the arbitration agreement] "empower[ed] an arbitrator to decide issues of arbitrability," such as the

---

MPIRE "challenged only the validity of the [arbitration] contract as a whole." *Id.* "Nowhere in [MPIRE's] opposition to [the] motion to compel arbitration did [it] even mention the delegation provision." *Id.*

validity of the arbitration agreement itself, and "serve[d] as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator"); Wells Fargo Advisors, 884 F.3d at 396 (similar).

Indeed, at least one district court in this Circuit—interpreting identical language—has already concluded exactly that. Corpus Christi Indep. Sch. Dist. v. Amrisc, LLC, 2019 WL 2051696, at *3 (E.D.N.Y. May 9, 2019) ("The Second Circuit has found similar language sufficiently broad to delegate gateway issues to the arbitrator.") (citing PaineWebber and NASDAQ); accord Adcock Prop. Mgmt., LLC v. Certain Underwriters at Lloyd's London, 2023 WL 7929003, at *5 (S.D. Miss. Mar. 20, 2023) (interpreting nearly-identical provision and holding that because "the Policy contains a broad, unchallenged delegation clause, the Court may not decide questions of arbitrability"); 5556 Gasmer Mgmt. LLC v. Underwriters at Lloyd's, London, 463 F. Supp. 3d 785, 791 (S.D. Tex. 2020) (holding that a nearly identical "delegation clause [] textually refers *all* disputes to arbitration including gateway issues of arbitrability"); Ytech 180 Units Miami Beach Invs. LLC v. Certain Underwriters at Lloyd's, London, 359 F. Supp. 3d 1253, 1266 (S.D. Fla. 2019) (same).

The District Court therefore erred in failing to delegate to the arbitrators MPIRE's challenge to the validity of the arbitration agreement. Indeed, the District Court failed to address it at all. Rather, after reciting the legal standard for delegation

of threshold issues, the District Court did not analyze the Policy language here, let alone conclude that it was appropriate for the court to decide arbitrability. A252. Instead, it simply assumed that MPIRE's challenge to the validity of the arbitration clause was its to decide, even though the delegation clause expressly made "all matters in difference"—including "validity"—the arbitrators' to decide. A252, A67.

This Court should reverse the District Court's decision and this matter should proceed to arbitration, where the arbitrators can consider MPIRE's claim that a Louisiana statute—empowered by the MFA—renders the arbitration agreement unenforceable despite the New York Convention.

## II. State Law Does Not Reverse-Preempt Article II(3) of the New York Convention, Regardless of this Court's Conclusion in <u>Stephens</u>.

Even if the Court were to decide the arbitrability question, it should nevertheless compel arbitration because the New York Convention directs that the Court "*shall*, at the request of one of the parties, *refer the parties to arbitration*." New York convention art. II(3). Because the MFA only applies to an "Act of Congress," and the New York Convention is not such an act, the standard Supremacy Clause analysis applies. So, Section 868—whether or not it bars arbitration clauses of this type—is preempted by this "Treaty made . . . under the Authority of the United States," U.S. Const. art. VI, cl. 2, and the Court should follow the New York Convention's command.

19

The District Court did not enforce the New York Convention simply because of this Court's opinion in Stephens, which has become an outlier in the nearly 30 years since it issued. A253. In Stephens, a panel of this Court first found, without analysis, that "the Convention is not self-executing, and therefore, relies upon an Act of Congress for its implementation." 66 F.3d at 45 (citing Foster v. Neilson, 27 U.S. 253, 312 (1829), overruled on other grounds by United States v. Percheman, 32 U.S. 51 (1833)), but failing to explain how that case led to its result). The panel then concluded, again without analysis, that "the implementing legislation" of the New York Convention is an "Act of Congress" under the MFA and so state insurance law may reverse-preempt the New York Convention's strictures.

But intervening Supreme Court precedent casts significant doubt on Stephens. In Medellín, the Supreme Court explained that a treaty is self-executing where it includes "a directive to domestic courts" that provides that the court "shall" or "must" take an action. 552 U.S. at 508. This tracks the New York Convention: "The *court* of a Contracting State . . . *shall*, at the request of one of the parties, *refer the parties to arbitration*." New York Convention ((emphases added). So for all the reasons below, the Court should take this opportunity to correct the Stephens panel's misstep and bring this Court's caselaw back into alignment with its sister circuits that have ruled on the same central issues post-Stephens.

A. **Intervening Supreme Court Precedent Casts Sufficient Doubt on <u>Stephens</u> such that this Panel Is Free to Re-Do the Analysis and Reach the Correct Result.**

Ordinarily, a Second Circuit panel is "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of [this] Court or by the Supreme Court." <u>In re Zarnel</u>, 619 F.3d 156, 168 (2d Cir. 2010). But there is an exception: if "there has been an intervening Supreme Court decision that casts doubt on [the Second Circuit's] controlling precedent," a later panel is no longer so bound. <u>Gelman v. Ashcroft</u>, 372 F.3d 495, 499 (2d Cir. 2004) (quoting <u>Union of Needletrades, Indus. & Textile Emps. v. U.S. I.N.S.</u>, 336 F.3d 200, 210 (2d Cir. 2003)) (cleaned up). The intervening decision need not address the precise issue decided by the panel for this exception to apply, and its "effect on [this] Court's precedent may be subtle." <u>Wojchowski v. Daines</u>, 498 F.3d 99, 106–09 (2d Cir. 2007) ("Although [the Supreme Court's intervening decision's] effect on our Court's precedent may be 'subtle,' it is nevertheless fundamental and requires us to hold that [the challenged case] is no longer good law.") (cleaned up); <u>see also</u> <u>Loyal Tire & Auto Ctr. v. Town of Woodbury</u>, 445 F.3d 136, 145 (2d Cir. 2006) (Sotomayor, J.) ("We note that we may reconsider a prior panel's holding if, *inter alia*, an intervening Supreme Court decision overrules our holding or casts doubt on our controlling precedent.").

Here, the intervening Supreme Court precedent is not subtle. The Supreme Court has long drawn "the distinction between [self-executing] treaties that automatically have effect as domestic law, and [non-self-executing treaties] that—while they constitute international law commitments—do not by themselves function as binding federal law." <u>Medellín</u>, 552 U.S. at 504 (citing <u>Foster</u>). But it gave significantly more guidance to courts post-<u>Stephens</u> on how to tell the difference.

The Supreme Court has now made clear that to determine whether a treaty is self-executing, the Court begins with the treaty's text. <u>Medellín</u>, 552 U.S. at 506. In <u>Medellín,</u> the Court held that under Article 94 of the United Nations Charter, the decisions of the International Court of Justice had no immediate domestic legal effect because Article 94 "is not a directive to domestic courts" and "does not provide that the United States 'shall' or 'must' comply with an ICJ decision, nor indicate that the Senate that ratified the U.N. Charter intended to vest ICJ decisions with immediate legal effect in domestic courts." <u>Id.</u> at 508. "Instead," the Supreme Court explained, "[t]he words of Article 94 . . . call upon governments to take certain action," and "the U.N. Charter reads like 'a compact between independent nations' that 'depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it.'" <u>Id.</u> at 508–09.

But where a treaty provides a clear "directive to domestic courts," it is self-executing. Id. In other words, a non-self-executing treaty, as an international promise, "addresses itself to the political, not the judicial department." Id. at 516 (citation omitted). A self-executing treaty orders domestic courts to enforce the treaty's provisions. Id. at 508.

Unlike Article 94 of the U.N. Charter, which Medellín analyzed, Article II(3) of the New York Convention directly commands domestic courts (not a political department) to order arbitrable disputes to arbitration. The command could not be clearer: "The court . . . shall . . . refer the parties to arbitration …" New York Convention art. II(3). This mandatory language directed to the judiciary makes the New York Convention self-executing. See generally United States v. Kahn, 5 F.4th 167, 174 (2d Cir. 2021) ("The word 'shall,' in a statute, indicates a command; what follows the word 'shall' is mandatory, not precatory.") (cleaned up). The executive branch was not making a promise that the United States would consider enforcing arbitration agreements; it unambiguously agreed that the United States courts would do so.

Stephens' contrary approach—holding that the New York Convention is not self-executing—directly conflicts with Medellín, as the Ninth and First Circuits have recognized. See generally In re Zarnel, 619 F.3d at 169 (citing sister-circuit decisions

when finding previous panel decision erroneous); Greathouse v. JHS Sec. Inc., 784 F.3d 105, 117 (2d Cir. 2015) (same).

The Ninth Circuit noted that Stephens "did not undertake an analysis of the Convention's text, drafting and negotiation history, or the views of the executive," all required under Medellín. CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Ga., LLC, 8 F.4th 1007, 1016 (9th Cir. 2021) (recognizing that Stephens "was decided more than twenty-five years ago, before the Supreme Court issued Medellín," and—crucially—"without the benefit of Medellín's guidance"); see also Safety Nat'l, 587 F.3d at 735 (5th Cir. 2009) (en banc) (Clement, J., concurring) (explaining that the Stephens court "undertook no textual analysis and set forth no reasons to support its conclusion" and that "the case was decided before Medellín, which provides critical guidance to lower courts for determining when treaty provisions are self-executing").

The First Circuit agreed, explaining that Stephens "offered no analysis of the text of Article II(3), and contained little explanation for why it concluded that the Convention was in relevant part non-self-executing." Green Enterprises, LLC v. Hiscox Syndicates Ltd. At Lloyd's of London, 68 F.4th 662, 668 (1st Cir. 2023). The Ninth Circuit also observed that Stephens "seemed to rely exclusively on the existence of the Convention Act to conclude the Convention is non-self-executing," even though there are a panoply of reasons why Congress would need to pass the

24

Convention Act despite the New York Convention being self-executing. CLMS, 8 F.4th at 1016.

Moreover, the First and Ninth Circuits, as well as the Solicitor General of the United States, have all noted that only a year after Stephens, a different panel of *this* Court issued an opinion in tension with Stephens and directly called its holding into question. See Stephens II, 69 F.3d at 1233 n.6.

This is more than enough to unbind this panel from Stephens' erroneous holding. That is plain when comparing the guidance given by Arbaugh v. Y&H Corp., 546 U.S. 500 (2006)—which led a panel of this Court to overrule prior Circuit precedent—to the guidance given by Medellín. Before Arbaugh, this Court had held that a complaint's failure to satisfy statutory requirements to obtain relief deprived the district court of subject-matter jurisdiction. In re BDC 56 LLC, 330 F.3d 111 (2d Cir. 2003), abrogated by In re Zarnel, 619 F.3d 156 (2d Cir. 2010). But then, the Supreme Court set out a clearer standard for resolving when a statutory limitation is jurisdictional (or not), namely when Congress says it is jurisdictional. See Arbaugh, 546 U.S. at 516. On the basis of that clarification, even though Arbaugh was about Title VII and BDC was about the section 303 of the bankruptcy code, this Court held that "in light of Arbaugh, In re BDC 56 LLC can no longer be considered good law on this point" and re-did the analysis. In re Zarnel, 619 F.3d at 169.

This Court is, similarly, free to re-do the analysis here using Medellín's clear standard for determining when a treaty is self-executing. Under Medellín, the New York Convention is self-executing, like the First and Ninth Circuits have held, and as the Executive has stated.

**B.** **Stephens Aside, the First, Fourth, Fifth, and Ninth Circuits hold that the MFA Does Not Allow State Laws to Preempt the New York Convention, a View Shared by the United States Government.**

After Stephens and Medellín, this issue—whether the MFA permits state law to reverse-preempt the New York Convention—has been addressed by four of this Court's sister circuits. Each circuit—the First, Fourth, Fifth, and Ninth—has held that state law does not reverse-preempt the New York Convention, although they break into two camps for why. The Executive agrees with both. This Court should align its precedent with its sister circuits and the Executive's position by reversing the decision on appeal.

**1.** **The New York Convention is Self-Executing, so the MFA Does Not Apply.**

For the reasons explained above, Medellín compels the conclusion that the New York Convention is self-executing. The First and Ninth Circuits—relying in part on Medellín and expressly rejecting Stephens—have concluded that Article II(3) of the New York Convention was self-executing. There is no reason for this Court to disagree.

The Ninth Circuit[7] explained that, "rather than speaking in broad, aspirational terms," the New York Convention speaks directly to the courts of a contracting state. Applying <u>Medellín</u>, it found that "this provision is addressed directly to domestic courts, mandates that domestic courts 'shall' enforce arbitration agreements, and 'leaves no discretion to the political branches of the federal government whether to make enforceable the agreement-enforcing rule it prescribes.'" <u>CLMS</u>, 8 F.4th at 1013 (quoting <u>Safety Nat'l</u>, 587 F.3d at 735 (Clement, J., concurring)). Given that, the Ninth Circuit concluded that "a straightforward application of the textual analysis outlined in <u>Medellín</u> compels the conclusion that Article II, Section 3 is self-executing." <u>CLMS</u>, 8 F.4th at 1013. More recently, the First Circuit reached an identical conclusion. Also citing <u>Medellín</u>, it concluded that "the text of the Convention makes plain that Article II(3) provides a clear 'directive to domestic courts.'" <u>Green Enterprises</u>, 68 F.4th at 667. The First Circuit agreed that "Article II(3) by its express terms directly commands courts to channel arbitrable disputes to arbitration." <u>Id.</u>

---

[7] The Ninth Circuit was interpreting an arbitration clause nearly identical to the one here. <u>Compare</u> <u>CLMS</u>, 8 F.4th at 1009, <u>with</u> A67.

The United States also agrees that Article II(3) is self-executing—a view shared by the New York Convention's other signatories[8]—and "[i]t is [] well settled that the United States' interpretation of a treaty is entitled to great weight." Medellín, 552 U.S. at 513 (citing Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 184–85 (1982)); see also Abbott v. Abbott, 560 U.S. 1, 15 (2010) (same).

After the Fifth Circuit held that the MFA does not reverse-preempt the New York Convention (on different grounds, see below, Part II.B.2), Supreme Court review was sought. Upon the Supreme Court's invitation for the Solicitor General to file a brief "expressing the views of the United States," the Solicitor General was unequivocal: "In the government's view, Article II of the Convention is self-executing." Brief for the United States as Amicus Curiae, La. Safety Ass'n of Timbermen—Self Insurers Fund v. Certain Underwriters at Lloyd's, London, No. 09-945, 2010 WL 3375626, at *8-11.

The Solicitor General explained that the "text of Article II of the Convention strongly supports the Conclusion that Article II is self-executing." Id. at *8. And it noted that Stephens II "call[ed] into question the continuing vitality of the prior

---

[8] "For a vast majority of States, the New York Convention was considered as 'self-executing', 'directly applicable' and becoming a party to it put the Convention and all of its obligations in action." UNCITRAL, Note by the Secretariat, Report on the Survey Relating to the Legislative Implementation of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 1958), A/CN.9/656, at 6, 10 (2008), available at https://tinyurl.com/2td2je86.

Stephens decision." Id. at *18.[9] On the Government's recommendation, the Supreme Court then denied certiorari. La. Safety Ass'n of Timbermen--Self Insurers Fund v. Certain Underwriters at Lloyd's, London, 562 U.S. 827 (2010); see also CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Ga., LLC, 142 S. Ct. 862 (2022) (again denying certiorari).

The New York Convention is self-executing. There is no argument that a self-executing treaty is subject to the MFA, which is limited to "Act[s] of Congress." See CLMS, 8 F.4th at 1016-17 (explaining that a treaty is not an "Act of Congress" under the MFA because they only require the approval of the Senate and because the Supremacy Clause itself distinguishes between "Laws of the United States" and "Treaties"). The New York Convention thus preempts Louisiana law, and the Court should compel arbitration.

### 2. Even if the New York Convention were Not Self-Executing, the MFA Still Does Not Apply.

Even if the New York Convention were not self-executing, there is no basis to believe that "when Congress used 'Act of Congress' in the [MFA], it intended that phrase to exclude self-executing treaty provisions but to include treaty provisions that are implemented by federal legislation." Safety Nat'l, 587 F.3d at 723. As the

---

[9] The conflict between the later-decided Stephens II and Stephens was also noted by two of the courts of appeals that rejected Stephens. See ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 385 (4th Cir. 2012); Safety Nat'l, 587 F.3d at 732.

en banc Fifth Circuit explained, that conclusion is "untenable" because "[t]he commonly understood meaning of 'Act of Congress' does not include a 'treaty,' even if the treaty required implementing legislation." Id.; see also id. n.35 (providing examples of other legislation where Congress does not "appear to distinguish between self-executing and implemented, non-self-executing treaties when using the term 'treaty' in a generally applicable sense").

The reason is simple: "A treaty remains an international agreement or contract negotiated by the Executive Branch and ratified by the Senate, not by Congress. The fact that a treaty is implemented by Congress does not mean that it ceases to be a treaty and becomes an 'Act of Congress.'" Id. Therefore, even if the New York Convention were not self-executing, it would still preempt Section 868. The Fourth Circuit has held the same. ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 388 (4th Cir. 2012) ("[E]ven assuming Article II of the Convention is non-self-executing, the Convention Act, as implementing legislation of a treaty, does not fall within the scope of the McCarran–Ferguson Act.").[10]

---

[10] Further, the Convention Act, which implemented the New York Convention, itself indicates that it is the treaty not the act that would preempt Section 868, such that the MFA would not apply. It says that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws *and treaties* of the United States." 9 U.S.C. § 203 (emphasis added). And, importantly, the Convention Act points courts to the New York Convention to provide the rules of decision. Safety Nat'l, 578 F.3d at 724-25.

This view is also shared by the Executive, whose views—as discussed above—receive great weight. As the Solicitor General explained, it is the Executive's view that the MFA "comes into play only when an 'Act of Congress' is construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." Solicitor General's Brief at *13-14. But, explained the Solicitor General, "because a treaty is not an 'Act of Congress,' the McCarran-Ferguson Act does not save state insurance regulation from the preemptive effect of a treaty provision that is enforceable in United States courts." Id. And "even if the judicially-enforceable character of the relevant treaty provision depends on the antecedent enactment of an implementing statute" (that is, "even if legislation were necessary to make Article II of the Convention binding upon United States courts"), "Congress has enacted such legislation, and Article II accordingly supersedes contrary state law, including state insurance regulation." Id.

Indeed, the Supreme Court has indicated that the MFA was "directed to implied preemption by *domestic* commerce legislation," and "[a]s the text itself makes clear, the point of [the MFA]'s legislative choice of leaving insurance regulation generally to the States was to limit congressional preemption *under the commerce power*, whether dormant or exercised." Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 428 (2003) (emphasis added). So as the Fourth Circuit concluded, Garamendi "demonstrate[s] that Congress did not intend for the [MFA] to permit

state law to vitiate international agreements entered by the United States." <u>ESAB</u>, 685 F.3d at 389 (citing <u>F.T.C. v. Travelers Health Ass'n</u>, 362 U.S. 293, 300 (1960) (stating that the MFA was not intended to permit a state to "regulate activities carried on beyond its own borders")).

The Fourth Circuit then relied on this Court's decision in <u>Stephens II</u> because there the Court explained that the "'international-law origins of the [Foreign Sovereign Immunities Act]' were 'so different from the kind of congressional statutory action that the [MFA] was enacted to deal with,' that they 'virtually compel[led] the conclusion' that the MFA did not authorize state law to displace the FSIA." <u>Id.</u> (quoting <u>Stephens II</u>, 69 F.3d at 1231). There can be nothing with more "international-law origins" than a treaty and its implementing statute. If the FSIA was freed from the MFA's grasp, so too is the New York Convention.

Bottom line: "[n]othing in [the MFA] suggests that, by enacting that statute, Congress intended to delegate to the states the authority to abrogate international agreements that this country has entered into and rendered judicially enforceable." <u>ESAB</u>, 685 F.3d at 390. Thus, even if the New York Convention were not self-executing, the MFA would still not apply.

C. **In all Events, this is an Ideal Case for this Court's Mini-En Banc Procedure Since Every Post-<u>Stephens</u> Indication Points to it Being Wrongly Decided.**

To the extent the panel feels bound by <u>Stephens</u>' bare-bones discussion, this is a perfect case for the use of this Court's mini-en banc procedure. Under it, the panel can overturn <u>Stephens</u> whether or not the intervening precedent cast sufficient doubt to unbind the panel. <u>See</u> <u>United States v. Peguero</u>, 34 F.4th 143, 158 n.9 (2d Cir. 2022) (noting that the "mini-en banc" procedure is "in addition to" an individual panel's ability to overrule a prior ruling under the circumstances outlined above).

Or, if this Court concludes that mini-en banc review also is unwarranted, the split between this Court and four of its sister circuits is a sufficient basis for deciding the case en banc. <u>See</u> Fed. R. App. P. 45(c). The intervening developments (detailed above) amply support jettisoning <u>Stephens</u>, or at the very least, providing analysis it did not provide to support its outlier conclusion, no matter how this Court does so.

III. **The New York Convention Aside, Section 868 Does Not Apply to Bar Arbitration Here.**

The Supreme Court has instructed United States courts to be "most cautious before interpreting its domestic legislation in such manner as to violate international agreements." <u>Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer</u>, 515 U.S. 528, 539 (1995). But no matter how this Court resolves the intersection of the New York Convention and the MFA issues discussed above, it should hold that the District Court erred in finding that Section 868 is an "anti-arbitration statute" that overrides

33

the arbitration clause in the surplus lines insurance policy here. A257. This Court should instead hold that Section 868 and the Policy's arbitration clause can coexist, and therefore give effect to the Policy by compelling arbitration.

To begin, there is no dispute that the proper understanding and application of Section 868 has divided Louisiana courts. But the majority of courts hold that Section 868 permits arbitration provisions in surplus lines policies.[11] Indeed, late last

---

[11] Compare A258 (citing Fairway Vill. Condos. v. Indep. Specialty Ins., 2023 WL 2866944, at *5 (E.D. La. Apr. 10, 2023) (concluding that Section 868 prohibits arbitration clauses in surplus line policies), appeal pending, No. 23-30274 (5th Cir.), Next Level Hosp. LLC v. Indep. Specialty Ins., 2023 WL 2771583, at *6-7 (W.D. La. March 31, 2023)), and Bufkin Enters. LLC v. Indian Harbor Ins., 2023 WL 2393700 (W.D. La. Mar. 7, 2023), appeal pending, No. 23-30171 (5th Cir.), with Carrollton Street Properties, LLC v. Indep. Specialty Ins. Co., 2024 WL 404955, at *3 (E.D. La. Feb. 2, 2024) (rejecting Bufkin and holding that "arbitration clauses are 'forum or venue selection clauses' under the terms of" 868(D)); Napoleon Apartments, LLC v. Indep. Specialty Ins. Co., 2024 WL 398427, at *1 (E.D. La. Feb. 1, 2024) (rejected Fairway Village, Next Level, and Bufkin, and holding that "surplus lines insurance policies are exempted from the prohibitions in" Section 868(2)(2) by 868(D)); Siddiqui Enterprises, LLC v. Indep. Specialty Ins. Co., 2024 WL 209037, at *3 (E.D. La. Jan. 19, 2024) ("The United States Supreme Court and the Louisiana Supreme Court have concluded that an arbitration clause is a type of forum or venue selection clause."); Causeway Partners, LLC, v. Indian Harbor Ins., 2024 WL 183484, at *4 (E.D. La. Jan. 17, 2024) ("joining other Courts of this district [to hold] that arbitration agreements do not deprive the courts of this state of jurisdiction, but rather act as forum or venue selection clauses.") (cleaned up); Harbor Homeowner's Ass'n v. Certain Underwriters at Lloyd's, London, 2024 WL 147853, at *2 n.19 (E.D. La. Jan. 12, 2024) ("La. R.S. 22:868(D) does not prohibit arbitration clauses in surplus lines policies."); Union Bethel African Methodist Episcopal Church v. Indep. Specialty Ins. Co. et al., 2023 WL 8804895, at *4 (E.D. La. Dec. 20, 2023) (same); 711 Tchoupitoulas Condo. Ass'n, Inc. v. Indep. Specialty Ins. Co., 2023 WL 8716580, at *4 (E.D. La. Dec. 18, 2023) (the argument that courts "should make some kind of distinction between arbitration clauses and other forum

year, a judge enforced an arbitration clause nearly identical to the one here and specifically rejected the District Court's decision here in compelling arbitration. Southland Circle, LLC v. Indep. Specialty Ins. Co., 2023 WL 7688570, at *6 (E.D. La. Nov. 15, 2023).

On January 9, the Fifth Circuit heard oral argument in a case directly presenting this disagreement among the lower courts in that circuit about how to interpret Section 868. See Cameron Par. Recreation #6 v. Indian Harbor Ins. Co.,

––––––––––––––––––––

or venue selection clauses before arbitration clauses take jurisdiction away from the Eastern District of Louisiana … has been raised in response to a number of motions to compel arbitration involving surplus lines policies and has largely been rejected" (cleaned up)); Casa Angelo, Inc. v. Indep. Specialty Ins. Co., 2023 WL 8600462, at *3 (E.D. La. Dec. 12, 2023) (noting that "courts have upheld forum selection clauses in surplus lines insurance contracts delivered in Louisiana that designate non-Louisiana courts" and that "arbitration clauses are a type of forum or venue clause," and finding a nearly identical arbitration clause enforceable under Section 868); The Cornerstone Ass'n v. Indep. Specialty Ins. Co., 2023 WL 8257987, at *4 (E.D. La. Nov. 29, 2023) (holding that the 868(D) exception "applies to arbitration clauses, allowing enforcement of such clauses in surplus lines policies"); Heart 2 Heart Fam. Worship Ctr. v. Indep. Specialty Ins. Co., 2023 WL 8494536, at *2 (E.D. La. Nov. 1, 2023) ("Although generally prohibited in Louisiana insurance contracts under LA R.S. 22:868(A), LA R.S. 22:868(D) allows surplus lines insurers to include forum and venue selection clauses in their policies. Louisiana courts explicitly recognize arbitration clauses as a type of forum selection clause. Surplus lines insurers are thus not prohibited from including arbitration clauses in their policies."); Beachcorner Properties, LLC v. Indep. Specialty Ins. Co., 2023 WL 7280516, at *5 (E.D. La. Nov. 3, 2023) (holding that arbitration clauses in surplus lines policies are enforceable pursuant to Section 868(D)), Ramsey v. Indep. Specialty Ins. Co., 2023 WL 5034646, at *5 (E.D. La. Aug. 8, 2023) (same); Bourgeois v. Indep. Specialty Ins. Co., 2023 WL 6644171, at *4 (E.D. La. Oct. 12, 2023) (same); and Queens Beauty Supply, LLC v. Indep. Specialty Ins. Co., 2023 WL 7154117, at *3 (E.D. La. Oct. 31, 2023) (same).

Nos. 23-30181 et al. (5th Cir.). And additional cases, in which the same question has been squarely presented, are fully-briefed and awaiting an argument date. See, e.g., Bufkin Enterprises, LLC v. Indian Harbor Ins. Co. et al., No. 23-30171 (5th Cir.); Indian Harbor Ins. Co. et al. v. Belmont Commons, LLC, Nos. 23-30246 et al., (5th Cir.).

      Thus, this Court need not weigh in on the issue in the first instance but can simply follow what the Fifth Circuit decides, as this Court's longstanding precedent requires. See Factors Etc. v. Pro Arts, 652 F.2d 278, 283 (2d Cir. 1981) ("Where, as here, the pertinent court of appeals has essayed its own prediction of the course of state law on a question of first impression within that state, the federal courts of other circuits should defer to that holding, perhaps always, and at least in all situations except the rare instance when it can be said with conviction that the pertinent court of appeals has disregarded clear signals emanating from the state's highest court pointing toward a different rule."); accord Casey v. Merck & Co., 653 F.3d 95, 100-01 (2d Cir. 2011). Even in the unlikely event that the Fifth Circuit has not ruled by the time this case is submitted, should this Court need to reach the interpretation of Section 868, it could appropriately hold this case to await the Fifth Circuit's forthcoming guidance.

      Although this Court need not reach the interpretation of Section 868 and its application to surplus lines policies, there is nevertheless a straightforward path to

reversing the District Court on that basis without further guidance from the Fifth Circuit. While Subsection A of Section 868 generally precludes insurance contracts from "[d]epriving the courts of [Louisiana] of the jurisdiction or venue of action against the insurer," that provision is subject to a substantial and dispositive carveout. As Subsection D makes clear, "[t]he provisions of Subsection A of this Section shall not prohibit a forum or venue selection clause in a policy form that is not subject to approval by the Department of Insurance."

The Louisiana Supreme Court has explained that "[a]n arbitration clause has been characterized by this court as a type of venue selection clause." Donelon v. Shilling, 340 So. 3d 786, 790 n.6 (La. 2020)[12]; see also Hodges v. Reasonover, 103 So.3d 1069, 1076 (La. 2012) ("An arbitration clause does not inherently limit or alter either party's substantive rights; it simply provides for an alternative venue for the resolution of disputes."); Stadtlander v. Ryan's Fam. Steakhouses, Inc., 794 So.2d 881, 890 (La. Ct. App. 2001) ("An arbitration agreement is a 'kind of forum-selection clause.'" (citing Scherk v. Alberto–Culver Co., 417 U.S. 506, 519 (1974))).

---

[12] Donelon was also an insurance case. There, the Louisiana Supreme Court held that under La. R.S. § 22:2004 (entitled "Venue"), which specifies where an Insurance Commissioner "may" bring an action, the Insurance Commissioner could choose whether to litigate or arbitrate, in part because an arbitration provision is a type of venue selection clause. Donelon, 340 So.3d at 790 n.6.

37

The United States Supreme Court agrees. See EEOC v. Waffle House, Inc., 534 U.S. 279, 295 n.10 (2002) ("[A]rbitration agreements that are enforceable . . . only determine[] the choice of forum."); Scherk, 417 U.S. at 519 ("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute."); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.").

To recap, if Subsection A of Section 868 stood alone, maybe—without the New York Convention—the Policy's arbitration clause would be unenforceable because the effect of compelling arbitration may be to "[d]eprive the courts of [Louisiana] of the jurisdiction or venue." See, e.g., Doucet v. Dental Health Plans Mgmt. Corp., 412 So.2d 1385, 1384 (La. 1982) (holding that Section 868(A) "renders the arbitration provisions of [an insurance] contract unenforceable").

But Doucet—on which the District Court relied (see A256-57)—was decided almost 40 years before Section 868 was amended to include Subsection D, see INSURERS, 2020 La. Sess. Law Serv. Act 307 (S.B. 156). And here, Subsection D is dispositive. It states that "the provisions of Subsection A of this Section shall not

38

prohibit a forum or venue selection clause in a policy form that is not subject to approval by the Department of Insurance."

There is no question that surplus lines insurance of the type here is not subject to such approval. <u>See</u> La. R.S. § 446(A) ("The commissioner shall not require surplus lines insurers to file or seek approval of their forms and rates for property and casualty insurance except [under provisions regarding] public carrier vehicles."). So appellants are permitted to insert forum and venue provisions, like arbitration provisions, into their contracts. <u>See, e.g.,</u> <u>Southland Circle</u>, 2023 WL 7688570, at *6 ("the possibility that an arbitration clause may also oust a court of jurisdiction of action is of no import because Subsection D displaces Subsection A's proscription … Because an arbitration clause is a type of forum selection clause, it necessarily follows that arbitration clauses are included within the set of allowable clauses in surplus lines policies under Subsection D.").

## CONCLUSION

For all these reasons, this Court should reverse the District Court's denial of the Insurers' motion to compel arbitration.

Respectfully submitted,

February 9, 2024

/s/ Samuel B. Weiss

Wayne R. Glaubinger
David A. Nelson
Samuel B. Weiss
Mound Cotton Wollan & Greengrass LLP
One New York Plaza Fl. 44
New York, New York 10004
WGlaubinger@moundcotton.com
DNelson@moundcotton.com
SWeiss@moundcotton.com
Tel: (212) 804-4200
Fax: (212) 344-8066

*Attorneys for Petitioners-Appellants*

## CERTIFICATE OF COMPLIANCE

Under Fed. R. App. P. 32(g), I certify the following:

This brief complies with type-volume limitation of Local Rule 32.1(a)(4)(A) because the brief contains 9490 words, excluding the items exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionately spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

/s/ Samuel B. Weiss

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2024, I caused the above brief to be served

on all registered counsel through the Court's CM/ECF system.

/s/ Samuel B. Weiss